832 So.2d 447 (2002)
CITY OF PLAQUEMINE, Louisiana
v.
NORTH AMERICAN CONSTRUCTORS, INC., Berger & Associates, Previously Doing Business as Berger, Barnard & Thomas, Inc. and Barnard and Thomas Engineering, Inc., and Aetna Casualty and Surety Co.
No. 2000 CA 2810.
Court of Appeal of Louisiana, First Circuit.
November 8, 2002.
Rehearing Denied January 2, 2003.
*449 Michael R. Fontham, New Orleans, L. Phillip Canova, Jr., Plaquemine, for Plaintiff/Appellant, City of Plaquemine, LA.
Eric A. Kracht, Baton Rouge, for Defendant/Appellee, North American Constructors, Inc.
Before: CARTER, C.J., FOIL, and PARRO, JJ.
*450 CARTER, C.J.
The City of Plaquemine sued North American Constructors, Inc. (NAC), and its surety, Aetna Casualty & Surety Company, alleging NAC breached its contract with Plaquemine by failing to comply with the contract specifications when making improvements to the Plaquemine South Wastewater Treatment Plant. Plaquemine also sued Berger & Associates-South, Inc., the successor in interest to Barnard & Thomas Engineering, Inc. (B & T), and its insurer, Continental Casualty Company, alleging B & T failed to properly supervise the work, failed to ensure the work was in compliance with the contract standards, and failed to properly design the plant. Plaquemine sought damages for the expenses of demolishing the facility, replacement costs for constructing the facility "as new," damages, lost profits, contracting fees, legal fees, and engineering fees.
Plaquemine presented its case in a bench trial. When Plaquemine rested, NAC moved for a judgment of involuntary dismissal on two grounds: 1) that Plaquemine waived the defects when it accepted the work; and 2) that plaintiff failed to carry its burden of proof regarding damages. The trial court granted the motion, but this court reversed, finding that Plaquemine had presented sufficient evidence to establish its claim by a preponderance of the evidence. City of Plaquemine v. North American Constructors, Inc., 96-1355, p. 4 (La.App. 1st Cir.6/20/97), 709 So.2d 1086 (unpublished).
We remanded this case to the trial court, where the original trial judge recused himself. The case was allotted to a different judge, and defendant presented its case. At the close of all the evidence, the trial court requested that each side present briefs in the form of proposed findings of fact and conclusions of law. The trial court subsequently adopted NAC's proposed reasons as its own and rendered judgment in favor of NAC, dismissing Plaquemine's suit.[1] Plaquemine appeals.

STANDARD OF REVIEW
Plaquemine asserts only one assignment of errorthat the trial court erred in dismissing its suit. It asserts in brief that we need give little or no deference to the trial court's findings of fact, citing Miller v. Smith, 391 So.2d 1263 (La.App. 1st Cir. 1980), affirmed, 402 So.2d 688 (La.1981). In Miller, this court stated that it placed no real value on written reasons prepared by victorious counsel because the thinking process was that of an advocate in the lawsuit and not the judge. 391 So.2d at 1265. The Louisiana Supreme Court granted writs because of this statement on the standard of review, but rather than explicating the standard to be applied when the trial judge did not author the reasons for judgment, the supreme court simply stated that this court properly analyzed the evidence. 402 So.2d at 688. Justice Lemmon dissented, opining that we were "incorrect to disregard totally the trial court's decision on the merits, thereby putting the plaintiffs in a worse position than if the trial judge had simply rendered judgment without assigning reasons." Id. at 689.
In this court's most recent statement on this issue, we held that we cannot place any real value on the written reasons presented when they are drafted in their entirety *451 by counsel for one of the parties, but if there is some evidence supporting the reasons, we will not reject them totally. Bell v. Ayio, 97-0534, p. 3 (La.App. 1st Cir.11/13/98), 731 So.2d 893, 896.
NAC argues we should not reject the trial court's reasons because there is some evidence supporting them. It further argues that the manifest error standard of review should apply, as set forth by the supreme court in Stobart v. State, 617 So.2d 880 (La.1993). Under that standard, the issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the fact-finder's conclusion was a reasonable one. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact-finder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. But when documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact-finder would not credit the witness's story, the court of appeal may find manifest error even in a finding purportedly based upon a credibility determination. We must always keep in mind, however, that if the trial court's findings are reasonable in light of the record reviewed in its entirety, we may not reverse, even if convinced that had we been sitting as the trier of fact, we would have weighed the evidence differently. Id. at 882-883.
We have meticulously reviewed the 5,113 pages of pleadings and testimony, the hundreds of exhibits, the photographs, the depositions, the videos, and the concrete cores. After this review, we must conclude that under any standard, the trial court's judgment dismissing Plaquemine's suit must be reversed.

FACTUAL BACKGROUND
In 1986 Plaquemine hired B & T to design improvements to its South Wastewater Treatment Plant. These improvements included a new large concrete tank measuring 117 feet long and 43 feet wide that was divided by an 18-inch-thick wall into two separate chambersthe final clarifier and the chlorine contact chamberwith a sludge trough and a bypass trough running along the outside long walls of the structure. The final clarifier held raw sewage and sludge that was being treated with sewage-eating bacteria; the clarified water was then treated with chlorine in the chlorine contact chamber The On January 20, 1987, Plaquemine entered into a contract to pay NAC $1,450,000 to construct those improvements, as well as improvements to the North Wastewater Treatment Plant. NAC began construction in 1987 and completed the project in 1988.
In April 1988, the new construction was tested for leaks by filling both chambers with water and observing them for about two weeks. No puddles were seen above ground outside the tanks. Also in April 1988, thermal cracks were noticed in the tank. Some cracks were listed on the punch list and were repaired by NAC. B & T's project manager and design engineer, Carl J. Robichaux, stated that while he is no expert on concrete, the patching looked satisfactory to him. In August 1988 Robichaux recommended that Plaquemine accept the project as substantially complete. On September 26, 1988, Plaquemine filed its acceptance of the project into the public records. Shortly thereafter Plaquemine began operating the facility.
Almost immediately Plaquemine began having problems with the new facility. Solids that settled to the bottom of the final clarifier were supposed to be vacuumed *452 out by the Leopold unit at the bottom of the tank. But John Gautreau, Plaquemine's utility foreman, testified that after a week, the Leopold unit stopped working. Plaquemine never was able to get the Leopold unit to operate properly. So much sludge built up in the tank that the cable that pulled the Leopold unit across the bottom of the tank finally broke.
Although the purpose of improving the South Wasterwater Treatment Plant was to increase its capacity and bring the city into greater compliance with Environmental Protection Agency (EPA) regulations, environmental violations increased once the new facility began operating. Ronnie Rockforte, Plaquemine's Director of Utilities, testified Plaquemine had constant problems complying with EPA regulations once the new facility went on-line. E-coli bacteria was found in the chlorine contact chamber, and chlorine was killing the sewage-eating bacteria. At first Rockforte believed the problems were caused by the plant operators' lack of training. When the problems began, construction defects "never once entered [his] mind."
According to L. Phillip Canova, Jr., Plaquemine's City Attorney, EPA enforcement officers recommended the city hire the national engineering firm of R.W. Beck and Associates to analyze the facility's processes, the employees' training, and the process design of the facility. Beck studied the problem for about a year and recommended numerous operational modifications. Plaquemine implemented all of Beck's recommendations, but the EPA violations continued. By mid-1991 the EPA was threatening criminal prosecution of the mayor and board of selectmen. Still believing the problem was in the operation, Plaquemine hired Professional Engineering Consultants Corporation (PEC), a Baton Rouge civil engineering firm with sewage expertise, to run the plant, train the operators, go over each component of plant operation and make sure it worked properly, and improve the morale of the operators.
Daniel Miremont, a vice-president of PEC with experience in overseeing the operation of sewage plants, went to Plaquemine in an administrative role. Shortly thereafter, the Leopold unit broke down, and PEC decided to "pump it down" to make repairs. When the final clarifier chamber was emptied halfway, operators reported that water from the chlorine contact chamber was leaking into the final clarifier chamber. Miremont saw a hole in the common wall between the final clarifier and the chlorine contact chambers, about five feet from the floor. Water was pouring through the hole "much like if you turn on your faucet in your home at a fair pace."
The operators told Miremont that the area had been patched previously with some type of waterproofing agent. He wanted to get the leak fixed properly so he could get the system back on-line, so he called Bill Oliver of Oliver Company Services. Oliver was recognized as an expert in restoration, repair, and diagnosis of concrete.
Although both chambers were drained, water kept oozing from the hole on the final clarifier side. Oliver used a pressure washer to clean the area of the leak because it was quite dirty. In doing so, some of the cement matrix from the old patch came off, and he could see the problem was much bigger than he expected; he saw water and mud coming from the hole. He began chipping around the hole trying to find good concrete, but what he found was highly corroded reinforcing steel surrounded by gravel and mud, and no cement matrix. He never found good concrete, just porous, loose, poorly consolidated concrete known as "honeycomb." It *453 took him three tries to fix the hole, which he finally did using a rapid-setting hydraulic cement and calcium chloride. He stated using chlorides around reinforcement steel is generally a bad idea because of the corrosive effect, but he had no other option in this case because of the mud that kept oozing into the hole.
After the patch, the tank was filled to make sure it did not leak. Miremont noticed some spots on the common wall that stayed wet and some damp spots on the west wall. He talked to Oliver, who suggested that Plaquemine bring in Dean C. McKee, who had 45 years of experience as a concrete structural engineer and was president of McKee & Deville, Consulting Engineers. Plaquemine hired McKee to recommend a method to repair the tank. Before McKee went to the plant, the tank walls were waterblasted clean. On McKee's first visit to the plant, he was immediately concerned with the number of cracks in the tank. He had Oliver take core samples so he could have them tested.
Oliver was concerned because water was still oozing from the cracks after the walls were cleaned and the tank emptied. He also needed more information about the cracks because he could not give an estimate on how much resin, epoxy, or foam would be needed for injection into the cracks without knowing their depths and whether there were voids or honeycomb in the wall. To get this information, he decided to do a dye test, which involved injecting colored water into the cracks. This test was conducted in February 1992. During that test, as evidenced by the videos introduced at trial, Oliver discovered that water pumped into a crack in one place might come out five to six feet way or it might disappear into the wall. Several through-wall cracks were identified during the test.
Oliver advised Plaquemine that he could not fix the problems with the tank. Based on the results of the dye test, he did not believe the cracks could be repaired by injection. He also believed the tank could not be repaired with a liner because water would leak in through cracks in the outside walls, and with contraction and expansion during weather changes, the liner would be pushed off.
McKee also gave a negative report on the feasibility of repairing the facility. He testified he could not recommend a modest repairin fact, it was so bad he could not even conceive of the type of repair to recommend. The bottom line of his report to Plaquemine stated that the "structure cannot be economically strengthened and grout injected to provide a structure whose strength and life expectancy is equal to that of the one shown on the contract documents."
At that point Plaquemine gave up trying to repair the tank and began to consider litigation. In late 1992 Plaquemine hired Concrete Testing Laboratories (CTL), "a firm with a national reputation regarding concrete," to investigate the construction, and in May 1993 this suit was filed.

TRIAL COURT'S FINDINGS
The proposed factual findings adopted by the trial court are lengthy, and we find no manifest error in the majority of the findings that are strictly factual. Our problems with the trial court's factual and legal analysis arise from facts not discussed by the trial court that affect the legal analysis.
We agree with the trial court's findings that PTL's tests showed the compressive strength of the concrete complied with the contractual requirements.[2] That was never *454 in dispute. The trial court fails to mention, however, that PTL's tests also showed that most of the concrete tested failed to comply with the contractual requirements for "slump," a crude indication of the water/cement ratio and a measure of the concrete's stiffness or "flow-ability."[3] The specifications required that the concrete have a slump of no more than four inches. Results of lab tests of concrete taken at the site showed a large portion of the concrete (16 of the 19 samples tested) had an unacceptable slump or was a "soupy mix." Although the contract specified a four-inch slump, lab test results showed slumps of up to six inches.
We agree with the trial court's factual finding that no leaks were detected when B & T tested the tank in April 1988. But the circumstances surrounding that test make its results less than reliable. The test was done after the area around the tank had been backfilled, i.e., dirt had been placed around all external walls, so it was impossible to tell if water was leaking through the external walls. John Gautreau, Plaquemine's utilities foreman, recalled no measurements being taken during this test. Robichaux testified that because both chambers were filled with water, it was impossible to tell if the final clarifier chamber was leaking into the chlorine contact chamber or vice versa.
We agree with the trial court that the punch list from April 1988 included thermal cracks and that NAC completed all the items on the punch list to the satisfaction of B & T and Plaquemine. But Phillip Joseph Thomas, B & T's resident project representative on this project, testified the tank was full on the inside and backfilled on the outside when the punch list was made. Gautreau stated NAC plastered over the identified cracks, but the plaster later fell out and the concrete began delaminating, i.e., thin sheets of concrete began falling off the walls. Thomas described the repairs to the cracks on the punch list as "just cosmetics."
We agree with the trial court that Beck's retention letter from Canova states Beck was hired "for engineering services in connection with the complete review of the Plaquemine Sewerage Plants, including but not limited to the construction and operation of said Plants" and that Beck found no defects in NAC's construction work. Beck found no construction defects because it did not look for them. It is undisputed that Beck did not review the construction of the plant but instead concentrated on the processes and employee training. Beck's report to Plaquemine states it was "contracted to review plant operation and design in an effort to suggest ways to improve operating results."
We agree with the trial court that Plaquemine used this facility for its intended purpose for over three years. But a more accurate finding might have been that Plaquemine tried to use it for over three years. Gautreau testified the facility never worked properly. Peter R. Hollis, NAC's expert in sanitary engineering, environmental engineering, and design, testified the facility was so badly designed that it would not have worked properly even if it had been built perfectly. And during its last eleven months in operation, the facility racked up 95 EPA violations.
We agree with the trial court that there is no evidence this tank will immediately *455 collapse if placed back in service. We also agree with the trial court that steel that is encased in concrete is normally not at risk for corrosion. But we cannot agree with the trial court's conclusion that the preponderance of the evidence proved that this concrete tank is structurally sound and that the steel is not subject to any unusual risk of corrosion.
The trial court based this conclusion on the testimony of Jerry L. Householder, NAC's expert in engineering, diagnosis, and repair of concrete structures, and a discussion of a publication about the general properties of concrete by Michael P. Aderman, a structural engineer who testified on behalf of NAC. Householder testified without elaboration that, in his opinion, "This steel is not going to corrode." Aderman never went into the tank himself, and he examined the core samples for the first time at trial. He was hired to determine if the wall was about to fall down, but he saw no signs of "impending" collapse. He tested the deflection of the common wall and concluded that it is structurally sound. He stated, however, that he was not asked to do a structural survey of the tank but had merely performed a deflection test. He testified that he accepted the statement in CTL's report that there is a potential for future corrosion and reduction of design capacity of the wall.
In the words of Stobart, objective evidence so contradicts these witnesses' stories that the trial court committed manifest error in relying on them. In concluding that the steel was not at risk for corrosion, the trial court failed to mention that Oliver; McKee; Hans Kosel, a structural engineer and expert in the evaluation of problems with concrete; and Brian Stejskal, an evaluation engineer for CTL, all testified that the steel in the core samples showed pitting, an early sign of corrosion. The report of the petrographic analysis done on a slice of one of the core samples referred to "several small patches of corrosion." Kosel also noted that some of the cores had air pockets around the reinforcing steel, which causes "fluting." Fluting is the movement of water along the steel that produces a flute-like sound. Water moving along the steel carries with it the potential for corrosion.
Because of the potential for corrosion, Oliver questioned not the current structural stability but the durability and long-term structural stability.[4] While the structure currently is new and the reinforcing steel has not had time to corrode to any great extent, the numerous areas in the wall through which liquids can travel will eventually result in a faster rate of corrosion than if the steel were in sound compacted concrete. Oliver was not worried that the facility would fall apart in the next few years, but even if the cracks could be fixed somehow, he believed the facility would have a short lifespan.
McKee noted that the reinforcing steel found in the northeast corner honeycomb was "wrapped up with mud," which made it "no longer a structural element." McKee testified that the tank would not collapse if used today; from a structural standpoint it could be put back in service, but he could not make that statement from an environmental standpoint.
Kosel testified that in his opinion, as a structural engineer, the facility does not have the intended useful life. He based that opinion on his experience with similar *456 structures. The misplaced reinforcement steel, which is discussed below, impairs the tank's structural stability, the tank will continue to deteriorate, the steel will corrode, and the owner should not be in the position of having to continue to make costly repairs. He stated that the cracks, honeycomb, and cold jointsnon-planned intersections of concrete pours where new concrete has not tightly bonded to in-place concreteare all "bad things which compromise the durability of that wall." Although the half-cell potential measurement showed no active corrosion, the early corrosion was clearly observable in the photographs and on some of the steel in the core samples. He stated, "I believe it will fail. Everything I've seen, from early pitting corrosion to advanced corrosion, the wall section will eventually fail."
While steel properly encapsulated in concrete will not corrode, objective evidence in this case shows the steel has begun corroding. Even our untrained eyes can see the corrosion in the photographs of the steel in this structure in the northeast corner and the "gray popcorn" area. The photographs and the petrographic analysis are objective evidence of corrosion that belie Householder's opinion testimony. Thus, we find manifestly erroneous the trial court's conclusion that the preponderance of the evidence proved that the concrete tank is structurally sound and is not subject to any unusual risk of corrosion.
We also take issue with the trial court's conclusion that this structure can be used for its intended purpose without risk to the environment. The trial court relies on Hollis's opinion on this issue. Hollis acknowledged that the plant leaked but did not think the leaks were excessive. He believes that if the facility were placed in service today, it would not present a risk of environmental contamination.
Hollis's opinion is strongly contradicted by the testimony of Miremont and Thomas B. Killeen, Jr., Permit Program Manager with the Office of Water Resources, Water Pollution Control Division of the Louisiana Department of Environmental Quality, and by the objective evidence of the history of EPA citations to Plaquemine for environmental violations at this facility.
Miremont testified that while the plant was in operation, he could see the raw sewage entering the chlorine contact chamber at the bypass. After the final clarifier was shut down, however, fecal contamination in the chlorine contact chamber stopped.
During the last 11 months this facility was in operation (January through November 1991), while Plaquemine was attempting to use it for its intended purpose, Plaquemine was cited 95 times by the EPA. But since the new facility was taken out of service, Plaquemine has had better than 95% compliance rates and has even received an award from the EPA. In 1992 Plaquemine had seven total violations. It had no violations in 1993, one each in 1994 and 1995, and two in 1996.
Killeen testified that after a problematic part of a facility is taken out, it may take a few months to get back into the rhythm of proper treatment. He stated that a leak through an interior wall from one chamber to another is a violation of the operation and maintenance provisions of the city's permit, as is water seeping into the surrounding environment. Killeen noted that the specifications call for backfill of excavated sand and silt, neither of which is impermeable. In Killeen's opinion, it is not advisable to put the plant back into operation if it could leak into the surrounding environment.
The court cites Kosel's testimony that "if the facility did not leak, it could be *457 placed in service for its intended purpose" for 30 to 40 years. (We note that, according to federal guidelines, the life expectancy of a facility such as this one is fifty years.) Water permeating the wall, however, is leakage, and if that leakage cannot be fixed, the facility cannot be used as intended. Kosel stated that, in his opinion, this facility should not be placed back in service.
The hard, objective facts show that after Plaquemine complied with all of Beck's recommendations regarding improving the process and the operator training, the facility still had 95 EPA violations in eleven months. The trial court was clearly wrong in finding that this facility could be placed back into service for its intended use without risk to the environment.
We likewise find the trial court was manifestly erroneous in concluding that excessive water/cement ratio and other deficiencies in the concrete, such as the honeycomb; rock pockets, areas where rocks had collected due to improper consolidation; pour lines; cold joints; bug holes, small pockets of entrapped air caused by improper consolidation that leave small holes in the concrete; and cracks did not have any material adverse impact upon the overall performance of the concrete and did not prevent the tank from being used for its intended purpose. The trial court relied on Aderman, who testified that the concrete appeared to conform to the specifications, and Householder's description of the concrete as "adequate."
As noted above, Aderman never saw the tank when it was not filled with water; he observed only the top few feet of the concrete, and he never analyzed the core samples. Householder had a laissez-faire attitude about the concrete defects. When questioned about the honeycomb, he stated, "[I]t's not saying you're trying to excuse the contractor, because that is against what the current practice is, but I mean, that kind of stuff does happen." He testified the bug holes were of no concern and should be repaired only if they were going to be seen because "it [is] just an aesthetic thing." When asked about fluting, or air spaces beneath the reinforcing steel, he replied, "[A] little bit of that can happen, and does." On cross-examination he admitted he had never designed a sewer treatment plant or prepared specifications for one. He was also unfamiliar with the details of ACI 350, the required standard for this facility published by the American Concrete Institute.
The original trial judge's reference to this facility as "the concrete of the damned" seems a more accurate description than Householder's reference to it as "adequate, particularly in light of the contract specifications." The American Concrete Institute (ACI), a technical society dedicated to providing knowledge and information for the best use of concrete, produces technical reports and guides. Its Committee 350 reports on concrete sanitary engineering structures. The contract in this case provided that all concrete work was to conform to ACI 350, which requires concrete to be strong, durable, extremely dense, and as impermeable as possible, with limited deflection and cracking. ACI 350 1.1 states: "Because of the stringent service requirements of sanitary engineering structures, they must be designed with great care. The quality of concrete is of great importance, and close quality control should be performed during construction to obtain impervious concrete."
ACI 350 1.2 emphasizes the importance of watertightness and states that the ability of the structure to retain liquid will be reasonably assured if the concrete is well compacted, the crack width is minimized, the joints are properly designed and constructed, and impervious linings *458 are used if required. ACI 350 1.2 further notes that use of quality concrete and proper joint design is more economical and dependable than the use of linings. The report recommends obtaining minimum permeability of the concrete by using water-cement ratios as low as possible consistent with satisfactory workability and good compaction, as well as surface troweling and smooth forms.
Durability, the resistance of the structure to the deteriorating effects of its environment, is addressed in ACI 350 1.4. Again, good quality concrete with a smooth surface finish is recommended to resist chemical attack.
The contract specifications herein echo these ACI requirements. The contract requires that concrete be thoroughly compacted and specifies "a smooth, hard, uniform texture on the concrete" with all defects patched.
The surface, however, as evidenced by the photographs, core samples, videos, and witnesses' testimony, was anything but smooth. An eight-inch piece of rusty metal showed on the face of the concrete on one wall. Thomas testified he noticed honeycomb during the construction but reported it to the engineers, who had NAC patch it. Stejskal described the patching NAC had done to the surface as looking like thickened paint that had been "scrubbed on" in a swirl pattern. After reviewing the photographs, we agree; the surface looks more like textured stucco than smooth concrete.
According to Oliver, the concrete finish was irregular; he saw places that had been patched or rubbed over by hand, untreated bug holes, evidence of misaligned forms that had allowed cement and sand and water matrix to ooze between them, imprints of the wood grain of the forms impregnated into the face of the concrete, honeycomb, and cold joints. McKee noted "big beads of concrete" where the form boards had not fit together tightly enough, allowing mortar paste to escape, as well as cold joints. Stejskal testified he saw areas where materials had "debonded" from the concrete substrate, indicating a patch that had failed, as well as cold joints, voids, bug holes, and rock pockets. Kosel stated these surface defects made him suspect there was voiding inside the walls.
Other surface defects were discovered on the outside of the wall when a small area was excavated almost to the base of the slab. The majority of finished surfaces in that area were not consolidated, and visible voids extended up to two inches into the substrate. Plaquemine Mayor Mark Tony Gulotta testified that area had "hundreds of thousands of bug holes all over the place." Stejskal described the concrete as looking like "gray popcorn." Photographs in evidence show the gray popcorn area with exposed corroded steel. Stejskal noted numerous areas where the concrete did not encapsulate the reinforcing steel. He also found visible cracking. Stejskal stated his job involves investigating bad concrete, but this was the worst he had ever seen.
The poor condition of the concrete was dramatically shown in the photographs and core samples. McKee requested 12 four-inch core samples, cylinders bored out of the common wall. Oliver had A & B Coring Company remove the cores, and Oliver sent them to CTL for testing. Some were taken from "suspicious" places that McKee had selected; several others were chosen randomly. Stejskal stated cores were taken from "the good, the bad, and the ugly." Oliver testified his simple visual examination of the cores showed inconsistency in the distribution of sand, cement, and gravel matrix. He saw a number of bug holes ranging in size from smaller than a BB to *459 the size of a pea. Two of the cores had bug holes all the way around them. Kosel described these bug holes as "big old air bubbles." These voids, according to McKee, would adversely affect the permeability of the concrete.
McKee stated that some of the cores had white spots in them, which indicated the paste strength was reduced. Weak paste affects compressive strength to some degree, tensile strength, permeability, and long-term durability. One core had very little coarse aggregate, which, according to McKee, showed the contractor did not use a "tremie" to vibrate the concrete but instead "bounded] the concrete off the rebars,"[5] which is "just a terrible no-no."
As noted above, ACI 350 requires concrete to be strong, durable, extremely dense, and as impermeable as possible, with limited deflection and cracking. The photographs and videos demonstrated the permeability of this concrete due to cracks, voids and other subsurface defects, rendering it out of compliance with the contract.
The experts agreed that all concrete will crack due to ambient temperature variations (thermal cracking) and drying shrinkage, even with good concrete construction practices. Those cracks, however, are usually linear and limited in amount if the facility is properly designed and built. Stejskal described the cracking in this facility as the worst he had ever seen in concrete that was less than five years old. Oliver testified there were approximately 5,000 feet of cracks in the 117-foot-long common wall between the final clarifier and the chlorine contact chambers.
G. Russell Hall, a technical specialist project manager for CTL, monitored a leakage test at the facility. NAC filled the final clarifier chamber with water, but the chlorine contact chamber was left empty. He observed and marked 25 different areas of leakage through the 18-inch-thick common wall and one area of leakage on the north wall. He also recorded differences in the water level in the tank, which showed water was escaping.
Not only were there more cracks than there should have been, the cracks were wider than was acceptable. The tolerable crack width in a water-retaining structure, according to ACI 350, is .004 inches. Kosel testified the cracks in this facility were much more frequent than normal, and many were much wider than ACI 350 permits. Kosel documented cracks as wide as half an inch, more than ten times wider than permitted by ACI 350.
The dye test revealed that the cracks were multi-faceted, running in many directions. According to Oliver, that type of crack is very difficult to repair, unlike a crack that runs straight in a definite plane. Oliver also noted that during the dye test, water sprayed out like a showerhead in some areas, indicating honeycomb that had been cosmetically repaired without filling in the underlying voids. McKee stated that the dye test showed far greater internal cracking, with wider and longer cracks, than he had expected.
Kosel noted efflorescence on ten of the cracks. Efflorescence is a deposit that forms on the walls when water seeping through the cracks breaks down the concrete matrix, leaving a white paste behind. In addition to the cracks with white efflorescence, some cracks were green. Kosel testified the green color indicated water was migrating through the outside wall; the green was from outside soil conditions. Stejskal also noted the brown and green deposits on the west wall, indicating ground water leaking into the facility.
*460 Kosel further noted that the dye test showed water coming out of cold joints. Cold joints create a potential for a plane of failure, and cracks that form at that plane are usually through-wall cracks.
The trial court manifestly erred in relying on Aderman's and Householder's testimony that this concrete met concrete specifications when Aderman had not attempted to analyze it and Householder was not even familiar with the requirements of ACI 350. The contract and ACI 350 required "quality" concrete that was as impermeable as possible with limited cracking, good compaction, and a smooth surface finish. A simple examination of the concrete cores and the photographs shows that the finish was far from smooth. What Plaquemine got was concrete described by McKee as "definitely below anything you want to call average" and by Kosel as "cancerous."
ACI 350 requires the structure to retain water with no visible signs of leaking. Kosel testified adamantly that this structure is not fit as a watertight liquid-retaining structure. Permeability is the movement of water through uncracked concrete. Kosel stated that damp spots on an 18-inch-thick wall show the concrete's permeability. Concrete cannot be completely impermeable because it is a "hard sponge" with microscopic holes that absorb fluid, but the goal here was to have the tank as impermeable as possible.
Kosel testified that ACI 350 has no allowable leakage rate. No fluids from the sewage treatment plant should run into the environment, no chlorine should enter the chamber filled with sludge-eating bacteria, and no bacteria should enter the chlorine contact chamber. Unfortunately, all these circumstances could and did happen with the through-wall cracks in these walls.
The trial court concluded that the problems with the concrete did not prevent the tank from being used for its intended purpose. It is clear to us, however, that through-wall leaks that cause environmental violations do prevent the tank from being used for its intended purpose.
The trial court also found that the preponderance of the evidence proved that the cracks were caused by B & T's failure to specify an adequate number of construction joints to accommodate thermal contraction. The parties do not dispute that this facility was poorly designed. Justin Bottger, B & T's civil engineer who designed this structure, testified that the placement of contraction joints in the wall and the amount of reinforcing steel in the west wall were sufficient under the 1971 standards but not under the 1983 standards that were in effect when this facility was built. Bottger testified simply that he and B & T made an error in the design.
McKee stated that the insufficient number of joints led to increased cracking. Kosel agreed. Kosel testified that the primary cause of cracking is inefficient joints. If a wall does not provide enough joints, the wall will make its own joints by cracking. The design of the walls in this structure did not comply with ACI 350 in terms of joint spacing and horizontal steel, which contributed to the excessive cracking.
The bad design, however, was not the sole cause of the cracking or even the primary cause, according to Kosel; design defects and construction defects jointly caused the problem. The trial court did not mention the construction defect of improper concrete cover over the reinforcing steel.
The reinforcement steel used in the walls was supposed to be covered by 1-1/2 inches of concrete. The cores show steel covered by four or more inches of concrete. Of six cores with steel in them, only *461 one of them is even close to having the proper cover. And photographs of the gray popcorn area show corroded metal visible on the outside of the concrete. McKee described the concrete cover on the steel to be "tremendously greater" than what was specified in many places, which weakens the wall. He termed the control of the cover during construction "totally unacceptable."
Kosel used a cover meter to check the depth of concrete cover over the steel. He testified that only two areas met specificationsone on the west wall, and one on the outside of the west wall. The rest of the reinforcing steel is either buried too deep, up to 6 inches below the surface, or is too close to the surface, some less than one inch from the surface. Steel with inadequate cover is subject to attack by the elements, from chlorine in the tanks, from sulfates in the soil, and by oxidation. This leads to corrosion and durability issues.
Kosel testified that, in his opinion, lack of consolidation and vibration of the concrete was one of the causes of the cracking. His opinion that NAC failed to properly compact the concrete, as required in the contract, is based on the core samples, the number of shrinkage cracks, the results of the dye tests, the bug holes, and the honeycomb. Proper vibration causes the wet concrete to fill all the spaces and encapsulate the steel.
Kosel testified another cause of the cracking was excess water added to the concrete beyond specifications, making the concrete more permeable and allowing more shrinkage cracks to develop. Kosel testified that a wet mix increases shrinkage cracking, which will subsequently be affected by thermal cracking. This allows multiple cracks to develop that will allow water to pass through, and in turn larger thermal cracks will develop. CTL performed a petrographic exam on a slice of one core sample that showed the paste was weak. Kosel stated that the paste was weakened by the addition of too much water.
The objective evidencethe core samples showing improper cover and improper consolidation, and the lab tests on the concrete showing excessive water content demonstrates causes of cracking other than insufficient contraction joints, and the trial court manifestly erred in holding that the construction defects played no part in the cracking.
Having concluded the trial court erred in finding that NAC's construction defects did not contribute to the facility's problems and in finding that those construction defects did not prevent the facility from being used for its intended purpose without risk to the environment, we shall now discuss the difficult issue of apportioning fault between B & T and NAC.
APPORTIONMENT OF FAULT
Bottger admitted he and B & T erred in the design of the facility in the placement of contraction joints in the wall and the amount of reinforcing steel. B & T also failed to comply with its responsibility to ensure that NAC complied with the plans and specifications. The engineers at B & T reviewed the lab test results on the concrete and knew the concrete did not comply with specifications on slump, but no one stopped the job or rejected the concrete. Kosel believed that B & T was negligent in its failure to take action when the improper slumps were reported because B & T was designated as the owner's representative on the job. He stated that if he had been the engineer on this job and had seen the test results, he would have ordered that the wall be torn down.
*462 Stejskal and Kosel both testified that a competent engineer should have noticed the surface defects, which would lead one to suspect internal problems. Stejskal stated that if B & T had been following good engineering practices, its on-site representative would have checked the steel placement against the plans and specifications before the concrete was poured. Thomas admitted it was his job to measure to make sure the reinforcing steel was placed according to the specifications, which he failed to do.
McKee testified that while he could not quantify how much of the problem with this facility was attributable to the design, it was not possible that all, or even a majority, of the problems were attributable to the design. Kosel stated that the water/cement ratio, the permeability, the excessive cover and misplaced steel, the cold joints, the honeycomb and bug holes, and the improper compaction of the concrete had all contributed to the failure of the structure to be impermeable and watertight. He believed that the design of the reinforcing steel was a contributing cause but not a primary factor. Kosel testified that there would have been a greater probability of reducing the cracks if B & T had designed the walls with the proper number of contraction joints. However, even with more joints, there would have been cracking because of the misplaced reinforcing steel.
After reviewing all the evidence, we believe the fault for this fiasco must be equally shared between NAC and B & T. We thus apportion fault 50% to NAC and 50% to B & T.
DAMAGES
The trial court found that the preponderance of the evidence showed that concrete is a material that can be repaired easily, effectively, and cost-efficiently. We agree that this is generally true. Householder recited a litany of repair methods for concrete, stating that concrete can almost always be repaired, although he has seen some instances where it is "just cheaper" to start over. Stejskal agreed that "anything is fixable for a short period of time," but he added that if it were merely fixed, the longevity of the structure would be affected.
The trial court found that Plaquemine had failed to carry its burden of proof and was not entitled to recover any damages from NAC because it did not provide evidence of the cost of repairing the many defects in the facility. However, none of the experts who were originally hired to repair this facility believed it was economically feasible to do so. We find the trial court was legally wrong in requiring Plaquemine to prove the cost of repair when the evidence was overwhelming that the facility was one of those that, to use Householder's own words, was "just cheaper" to tear down and start over.
The trial court cited Thompson v. Simmons, 499 So.2d 517, 520 (La.App. 2d Cir. 1986), writ denied, 501 So.2d 772 (La. 1987), for the proposition that a plaintiff who has not properly supported a claim for repair costs should be denied recovery:
If a loss has been proved but the exact amount of the damage cannot be established, the trial court has reasonable discretion to assess damages based upon all the facts and circumstances of the case. A trial court, however, may not supply its own estimate of repair costs solely on the basis of a claimant's description of the damage sustained where the valuation of damage is susceptible of reasonable determination by experts and the cost of repairs is easily estimated (Citations omitted; emphasis added).
*463 There is nothing in this record, however, to suggest the cost of repairs could be easily estimated. Oliver explained why he did not think epoxy injections would be successful in repairing the cracks. First, the dye test led him to believe there were voids in the walls that would have to be filled. Epoxy resin generates heat, and when it expands, it puts stress on the tensile strength of the concrete. It then shrinks when it cools, which could generate another crack. Second, he was unable to judge the size and shape of the voids and thus could not determine the quantity of material to inject. Oliver stated there is a nondestructive radar test to determine the size and shape of voids. That test, however, cannot detect a void unless it is larger than a golf ball, even though a golf-ball sized void is a serious problem. Third, when cracks are multi-faceted and close to the surface, the movement of the wall in the future tends to break out the concrete where the cracks were formed.
Oliver testified that when city officials asked him about putting in a liner, he advised them that type of repair would not work. A liner could not repair the cracks on the outside walls and would not stop water from intruding into the structure, which would make the liner bubble. The cracks would then expand and contract with weather changes, which would push the liner off the wall. He also did not believe epoxy injections plus a liner was a workable solution. He testified he had tried that remedy four times at other facilities, and each time it had failed. He had tried both liquid paint-on linings as well as sheet fittings, but neither was successful.
Stejskal testified that CTL's original objective was to provide conceptual recommendations and a general estimate of the cost of repair, but because of the condition of the tank, a viable or economical repair concept could not be developed. Stejskal agreed with Oliver that a liner would not work. He stated that using a flexible hypolon sheet on the inside would be like putting a Band-Aid on the crack; it would not repair the underlying problem. He did not believe a hypolon sheet on the inside would adequately repair the structure because the driving force of moisture and water vapor behind the material in the ground water would break the surface bond between the sheet and the concrete. Furthermore, to keep the steel dry and avoid corrosion, the tank would have to be completely excavated, liner sheets applied, and then the area backfilled.
Kosel testified this structure cannot be fixed in an economical fashion. He stated that as a structural engineer, he must say that the tank has durability problems that cannot be fixed by any sort of repair. In his opinion, if the tank is not removed, it will continue to cause problems for Plaquemine.
Aderman did not agree with CTL's conclusion in its report that there is no economically viable repair. When questioned by the trial judge, Aderman stated that honeycomb, poor consolidation, and misplaced reinforcing steel are normal occurrences that can be repaired. He offered no repair scenario of his own, however. He acknowledged that the gray popcorn and large void in the northeast corner were unacceptable but noted the void had been repaired and the popcorn was repairable. Householder also believed repairs were economically feasible on this job, although he offered no support for that opinion. Householder had made no study of the cost of repair or the cost of replacement and offered no specifics regarding methods to repair the particular problems with these walls.
The experts in this case were unable to fathom the full extent of the voids and cracks inside the walls. Without this *464 knowledge, they had no way of determining how much grout, epoxy, or foam would be needed for repairs. Experts with experience with liners and coatings explained why those remedies would not work when there were cracks through exterior walls that extended approximately eight feet underground. And NAC's experts failed to explain how reinforcing steel that was buried under four or more inches of excess concrete could be easily repaired.
The trial court stated in its reasons that if Plaquemine were awarded damages for the cost of demolishing the facility and rebuilding, NAC would be required to pay for design defects for which it is not responsible. That statement is legally incorrect, however, since we have apportioned the fault between B & T and NAC. NAC will be required to pay only for the portion of fault for which it is legally liable.
We find that this facility cannot be repaired in an economically feasible manner. Furthermore, even if it could be repaired, Plaquemine would be deprived of a facility with a 50-year lifespan. Instead, it would have a multi-patched facility lacking durability and long-term structural stability. As Mayor Gulotta stated, all Plaquemine wanted was what it paid fornot a "cracked up cement plant," and not a plant with a liner that has to be replaced every few years.
Implicit in every construction contract is the requirement that the work of the builder be performed in a good, workmanlike manner, free from defects in materials or workmanship. Davidge v. H & H Constr. Co., 432 So.2d 393, 395 (La. App. 1st Cir.1983). The measure of a contractor's liability for noncompliance with a contract is set forth in Louisiana Civil Code article 2769:
If an undertaker fails to do the work he has contracted to do, or if he does not execute it in the manner and at the time he has agreed to do it, he shall be liable in damages for the losses that may ensue from his non-compliance with his contract.
If the defects are such that they cannot be corrected except by removing and replacing the construction, under the jurisprudence the owner may require the contractor to remove the object from his land and restore the premises to their prior condition. In addition, the owner is entitled to damages. Ilgenfritz v. Radalec, Inc., 226 La. 59, 74 So.2d 903, 906 (1954); Trahan v. Broussard, 399 So.2d 782, 786 (La.App. 3d Cir.1981). Plaintiff may not, however, be awarded what it would cost to replace the existing structure with a properly constructed new one, as this would place plaintiff in an improved condition to which he is not entitled. Plaintiff is entitled only to be returned to the condition he was in prior to the contract. Bourgeois v. Arrow Fence Co., Inc., 592 So.2d 445, 448 (La. App. 5th Cir.1991), writ denied, 596 So.2d 214 (La.1992); Trahan, 399 So.2d at 787.
The original contract price for this project was $1,450,000, which included work at both the North and South Wastewater Treatment Plants. The contract itself does not break that figure down between the two plants. Canova testified change orders and add-ons brought the total amount paid NAC up to $1,800,000, of which $1,000,000 was for the final clarifier and chlorine contact chamber at the South Plant. Therefore, we will use the $1,000,000 amount in our damage calculation.
Tuncer Anthony Arikol solicited estimates from local contractors for the demolition of the chlorine contact chamber and final clarifier and disposal of the concrete. He testified the cost of demolition and disposal ranged from $155,000 to about *465 $300,000.[6] The two estimates he obtained in 1995 from Cajun Contractors and Hartec Corporation listed costs of $156,721 and $291,500, respectively. Because of inflation since the 1995 estimates were given, we will adopt the higher estimate.
award it the engineering fees it paid B & T. However, Plaquemine settled with B & T during trial and dismissed it from this suit. NAC is not responsible for B & T's defective design.
Plaquemine also seeks to recover costs and attorney fees in connection with the litigation. Plaquemine contends in its brief that language in a performance bond obligates NAC for "all other expenses lawfully chargeable to the owner by reason of default or neglect of said contractor." We disagree. That language is contained in a paragraph describing when the performance bond shall become void; it contemplates payment by the contractor of damages it is legally obligated to pay. It does not add new legal obligations to the contractor over and above those obligations the law provides.
Plaquemine further contends language in another performance bond obligates NAC to pay attorney fees. We disagree there also. As a general rule, attorney fees are not recoverable by a successful litigant unless provided for by contract or statute. Campbell v. Melton, 01-2578, p. 15 (La.5/14/02), 817 So.2d 69, 80. We have perused the performance bond cited by Plaquemine very carefully and find no language obligating NAC to pay attorney fees.
We now must determine the date from which interest should attach to the award to Plaquemine. Prejudgment interest, which stems from the damages suffered by the victorious party, is meant to fully compensate the injured party for the use of funds to which he is entitled, but does not enjoy, because the defendant has maintained control over the funds during the pendency of the action. In contrast, postjudgment interest is a prospective award whose purpose is to encourage prompt payment of amounts awarded in the judgment, and to compensate the victorious party for the other party's use of funds to which the victor was entitled under the judgment. Sharbono v. Steve Lang & Son Loggers, 97-0110, p. 6 (La.7/1/97), 696 So.2d 1382, 1386. Interest on awards for active breaches of contract begins to run "from the moment" of an active violation of a contract under Louisiana Civil Code article 1989. L & A Contracting Co., Inc. v. Ram Indus. Coatings, Inc., 99-0354, p. 27 (La.App. 1st Cir.6/23/00), 762 So.2d 1223, 1239, writ denied, 00-2232 (La. 11/13/00), 775 So.2d 438. As we cannot tell from the facts of this case when the active breach began or the date payment was made by Plaquemine to NAC, we think it fair to award interest from the date of judicial demand as prayed for in Plaquemine's petition.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is reversed. Judgment is hereby rendered in favor of the City of Plaquemine and against North American Constructors, Inc., in the sum of $645,750 (50% of $1,291,500), plus interest from date of judicial demand until paid. NAC is cast for all costs.

REVERSED AND RENDERED.
PARRO, J., concurring in the result.
I agree with the majority opinion in all respects except the setting of damages, *466 which I believe should be more precise, in the following particulars.
I do not believe we should use the city attorney's estimate of $1,000,000 as the basis for the contract price, including add-ons and change orders, attributable to the construction at the South Plant. The City's Exhibit 116 shows that the portion of the contract expended for the defective tank was $549,977.50; in its brief to this court, the City acknowledges this amount as the contract price attributable to the defective tank. Absent any additional evidence concerning the add-ons and change orders, it is this amount that should be included in that item of damages.
I would also include in the total contract price the $107,643 engineering fee paid to B & T. Even though the City's claim against B & T was in contract and was settled, the amount paid was part of the total price of the defective tank, for which we have found B & T and NAC solidarity liable. Under Louisiana Civil Code article 1804, each solidary obligor is liable for his virile portion, and if the obligation arises from a contract, virile portions are equal in the absence of agreement or judgment to the contrary. The apportionment of liability we have assessed fully comports with Article 1804, and the settling parties bear the risk that the settlement amount might be greater or less than what might be imposed by judgment.
Combining these two contract prices would bring the total for this element of damages to $657,620.50. Although the record does not show exactly when the final contract price was paid, we know that acceptance of the project was filed into the public records on September 26, 1988. Based on the periodic invoices in the record, it appears that by that date, all the design and construction invoices had been paid. Since the City lost the use of its funds from that date forward, I would award judicial interest on the total contract price from that date.
With reference to the other items of damage, I agree with the majority that the higher estimate to remove the tank and return the site to its former condition, in the amount of $291,500, is an appropriate measure of damages. However, I would also include in the damage award the cost of the pre-litigation repair efforts, which, according to the in globo invoices in the record and the City's computations, totaled $187,615. On these items of damages, interest should run from date of judicial demand.
Using these more precise amounts, the total damages would be $1,136,735.50. The amount to be paid by NAC would be: $328,810.25, plus legal interest from September 26, 1988 until paid; and $239,557.50, plus legal interest from date of judicial demand until paid.
Therefore, I respectfully concur.
NOTES
[1] Aetna and Continental are not named in the judgment. The judgment also does not mention the third party demand that was filed by NAC against its other alleged insurers, The Standard Fire Insurance Company, Audubon Indemnity Company, Insurance Company of North America, and Aetna Casualty and Surety Company.
[2] PTLInspectorate (PTL) was an independent testing laboratory that took samples of the concrete during construction and performed certain tests for B & T.
[3] Slump is tested by placing wet concrete into a twelve-inch cone, which is then turned over and lifted off. The tester measures the amount the concrete oozes down, or slumps, after the cone is emptied.
[4] Durability, according to the Portland Cement Association, is the ability of concrete to resist deterioration from the environment or service in which it is placed. Closely related to durability is long-term structural stability, or the ability to meet the design criteria for the loads applied to it over any period of time.
[5] "Rebar" is a common term for reinforcing steel.
[6] Arikol's testimony was originally excluded as hearsay. After his testimony was submitted under a proffer, NAC withdrew its objection and the proffer was admitted.